## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

_____
)
GEORGE C. BOUGOPOULOS,                  )          Civ. No. 12-338
                    Plaintiff,          )
                                        )
v.                                      )
                                        )
ALTRIA GROUP, INC.                      )
  f/k/a PHILIP MORRIS COMPANIES INC.,   )
PHILIP MORRIS USA INC., and             )
R. J. REYNOLDS TOBACCO COMPANY, INC.    )
_____ )

### COMPLAINT AND JURY DEMAND

### PARTIES

1.  The Plaintiff, George C. Bougopoulos, is a natural person with a place of residence at 210 Brook Village Road, Unit 2, Nashua, Hillsborough County, New Hampshire 03062-2793, and his telephone number is 603-888-3486.

2.  Defendant Altria Group, Inc. ("Altria") is a corporation incorporated in the state of Virginia with a place of business at 6601 West Broad Street, Richmond Virginia  23230 and was formerly known as and/or is the successor of Philip Morris Companies, Inc. Altria does business in New Hampshire through its subsidiary Altria Group Distribution Company, Inc. f/k/a Altria Sales & Distribution Inc. whose agent for service of process in New Hampshire is CT Corporation Services, 9 Capitol Street, Concord, Merrimack County, New Hampshire  03301.  Altria's telephone number is 804-484-8505.

3.  Defendant Philip Morris USA Inc. ("Philip Morris") is a corporation incorporated in the state of Virginia with a place of business at 6601 West Broad Street, Richmond,

Henrico County, Virginia  23230.  Defendant Philip Morris USA Inc. is a wholly owned subsidiary and/or the United States tobacco division of Altria.  Philip Morris agent for service of process in New Hampshire is CT Corporation Services, 9 Capitol Street, Concord, Merrimack County, New Hampshire  03301.  Philip Morris' telephone number is 804-484-8505.

    4.  Defendant R.J. Reynolds Tobacco Company, Inc. ("R.J. Reynolds" or "Reynolds") is a corporation incorporated in the State of North Carolina with a place of business at 401 North Main Street, Winston-Salem, Forsyth County, North Carolina  27102. RJ Reynolds agent for service of process in New Hampshire is Lawyers Incorporating Service, 14 Centre Street, Concord, Merrimack County, New Hampshire  03301.  R.J. Reynolds' telephone number is 336-741-5000.

JURISDICTION AND VENUE

    5.  This Court's jurisdiction is conferred by Sections 1964(a) and 1964(b) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964, as amended; Section 1331 of the United States Judicial Code 28 U.S.C. § 1331, as amended; and Section 1332 of the United States Judicial Code 28 U.S.C. § 1332, as amended.  This Court's venue is conferred by Sections 1965(a) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1965(a), as amended (insofar as all Defendants have agents and/or transacted their affairs in the District of New Hampshire), and Section 1391(b)(2) of the United States Judicial Code 28 U.S.C. § 1391(b)(2), as amended.

2

STATEMENT OF THE CASE

GENERAL ALEGATIONS

6.  Scientific and medical evidence has established that cigarette smoking causes respiratory diseases, lung cancer, other cancers, heart disease, strokes and other diseases. Further, smoking related diseases are dose dependent that is, each and every exposure to cigarette smoke increases the risk of disease. Cigarette smoke contains numerous carcinogens and other constituents that are toxic to humans. Some of these constituents do not occur naturally in tobacco and/or were intentionally added to cigarettes by the Defendants during the manufacturing process.

7.  One of the diseases caused by cigarette smoking is Chronic Obstructive Pulmonary Disease (COPD)(also known as chronic bronchitis and emphysema or a combination of the two).  COPD is caused by noxious particles or gas, most commonly from tobacco smoking, which triggers an abnormal inflammatory response in the lung.  This is especially true if the smoke is deeply inhaled.  See generally, "Global Strategy for the Diagnosis, Management, and Prevention of Chronic Obstructive Pulmonary Disease: GOLD Executive Summary" *American Journal Of Respiratory and Critical Care Medicine*, Volume 176, Issue 6, September 15, 2007.  Smoking cigarettes is responsible in 80 to 90% of the cases of COPD in the United States.  This is due to the simple fact that cigarettes pack a hefty dose of harmful substances (tar nicotine, carbon monoxide, and cyanide) that damage the lungs.  The likelihood of developing COPD increases with age and cumulative smoke exposure, and almost all life-long smokers will develop

3

COPD, provided that smoking-related, extrapulmonary diseases (cardiovascular, diabetes, cancer) do not claim their lives beforehand.  COPD: the dangerous underestimate of 15% *The Lancet*, Volume 367, Issue 9518, Pages 1216 - 1219, April 15, 2006.  COPD was found to be causally related to smoking in 1964.  *United States v. Philip Morris USA, Inc.,* Civil Action No. 99-2496 (GK) United States District Court for the District of Columbia, August 17, 2006 (hereinafter *US v. Philip Morris*), Amended Final Opinion, Findings of Fact paragraphs 515 and 516, page 221, citing, *inter alia*, 1964 Surgeon General's Report.

8.  As documented in *US v. Philip Morris,* Amended Final Opinion, and in numerous lawsuits and government investigations, for at least fifty years, the Defendants and other tobacco companies have falsely and fraudulently denied, *inter alia*, that : (1) smoking causes COPD as well as many other diseases; (2) nicotine is a highly addictive drug which they manipulated in order to sustain addiction; (3) they intentionally marketed to young people under the age of twenty-one and denied doing so; and (4) they concealed evidence, destroyed documents, and abused the attorney-client privilege to prevent the public from knowing about the dangers of smoking and to protect the industry from adverse litigation results.

9.  Beginning in the early 1950's, as evidence regarding the harms of smoking surfaced, Defendants and other tobacco companies engaged in advertising campaigns to induce the public to believe that cigarette smoking was actually beneficial to one's health and insisted that there was no indication that cigarettes were unsafe. Defendants and other tobacco companies also developed the Tobacco Industry Research Committee ("TIRC")

to sponsor research into "all phases of tobacco use and health" and to handle public

relations for the tobacco industry in response to the growing body of scientific knowledge.

*US v. Phillip Morris,* Amended Final Opinion, Findings of Fact paragraphs 562-564,

pages 233 and 234.  Defendants and other tobacco companies also developed the Tobacco

Institute ("TI") in 1958.  Although stated to be a trade association, the Tobacco Institute

created, issued, and disseminated press releases, public statements, advertisements,

brochures, pamphlets, and other written materials on behalf of

Defendants (1) denying that there was any link between smoking and disease; that nicotine

was addictive; that cigarette companies marketed to youth; and that environmental

tobacco smoke posed a health risk; and (2) discrediting scientists and public health

officials who took a different position on these issues *US v. Philip Morris,* Amended Final

Opinion, Findings of Fact paragraphs 108-128, 151, 152, pages 65-73, 81-84.

   10.  In 1964, the Surgeon General's Report documented the link between smoking and

certain diseases.  *US v. Philip Morris,* Amended Final Opinion, Findings of Fact 642-660.

The Defendants both individually and through the TIRC, before and after the issuance of

the 1964 Surgeon General's Report, knowing their assertions were false, continued to

publicly insist that there was a scientific controversy and disputed scientific findings

linking smoking and disease.  The Defendants continually asserted that any connection

between any disease and cigarette smoking was an "open question".  *US v. Philip Morris,*

Amended Final Opinion, Findings of Fact paragraphs 628-641, 664-671, 706-809, pages

265-269, 279-281, 293-326.

11. In the 1960s, Defendant Reynolds established a facility in Winston-Salem, North Carolina, which used mice to research the health effects of smoking. In this facility, nicknamed the "Mouse House," Reynolds' scientists researched a number of specific areas, including studies of the actual mechanism whereby smoking causes emphysema. Internally, a Reynolds' commissioned report favorably described the Mouse House work as the most important of the smoking and health research efforts because it had come close to determining the underlying mechanism of emphysema.  Research done in Reynolds' science and health group located at the Mouse House was routinely withheld from the scientific community -- scientists were forbidden to both discuss and publish their findings.  As a result of the Mouse House work, Reynolds was aware that smoking was linked to emphysema. After extended exposure to smoke, the animals suffered weight loss and changes in metabolism of lipids both in surfactant and in lung and liver. RJR knew that exposing rabbits to tobacco smoke led to: slowing of heartbeat during puffs, decrease in pulse pressure, increased number of goblet cells, alveolar collapse, erythema of nasopharynx, acute pulmonary edema, erythema, endocardial hemorrhage, kidney disease, bronchial hyperplasia, emphysema, epithelial hyperplasia, bronchial edema, bronchiolar plugs, and gross lesions on lungs. *US v. Philip Morris,* Amended Final Opinion, Findings of Fact paragraphs 672-675, pages 281-282 citing, *inter alia*, Research Report titled "Initial Attempts at Exposing Rabbits to Whole Cigarette Smoke").

12.  The fact that Reynolds' scientists had produced emphysema in chronic-smoke-exposed rats was known to Defendant Philip Morris. In a 1969 Philip Morris document

6

concerning the biological research program at the Mouse House and the linkage it showed

to smoking and disease, a Philip Morris scientist wrote:

> I met Dr. Price from R.J Reynolds at the CTR-USA meeting of December 11 and
> 12, 1969. He mentioned doing chronic cigarette smoke exposure studies with rats.
> The animals received up to 500 cigarettes and emphysema was produced.

In 1970, Defendant Philip Morris's President complained to Reynolds about the work

going on in the Mouse House. Despite the progress made there, Reynolds responded to

the complaint by abruptly closing the Mouse House: disbanding the entire research

division in one day, without giving notice to the staff, firing all twenty-six scientists at the

Mouse House, and destroying years of smoking and health research.  The scientists were

told that the terminations were not a reflection on their work, but that "economic reasons"

caused a change in the direction of the company. When they were dismissed, they were

reminded that they had signed confidentiality agreements that meant they were not to

discuss company research.  *US v. Philip Morris,* Amended Final Opinion, Findings of Fact

paragraphs 676-677, pages 282-283.

13.  For decades Defendants knew and internally acknowledged that nicotine is an

addictive drug, that cigarettes are a nicotine delivery device, and that addiction can be

enhanced and perpetuated through manipulating both the amount of nicotine and the

method of nicotine delivery. Much of Defendants' knowledge of nicotine was obtained

from in-house and industry-funded research into the pharmacological effects of the drug.

*US v. Philip Morris,* Amended Final Opinion, Findings of Fact paragraphs 882-888,

pages 350-352.  For example:

A.) In a September 22, 1959 memorandum, Philip Morris's Vice President for Research and Development, Hugh Wakeham, emphasized the importance of nicotine to smoking, stating: "One of the main reasons people smoke is to experience the physiological effects of nicotine on the human system." In a November 15, 1961 presentation, Wakeham addressed the company's ability to control the nicotine content of its cigarettes. He stated that "low nicotine does stimulate, but high doses depress functions," and "continued usage develops tolerance." On March 5, 1964, William L. Dunn, a Philip Morris scientist/psychologist who later became the Principal Scientist for the company, commented on the possibility of developing a "surrogate" for cigarettes based on the importance of nicotine and wrote that any less hazardous cigarette product developed by Philip Morris "must induce the psychopharmacological state now induced by nicotine absorption into the bloodstream." A handwritten summary by Philip Morris researcher Ronald Tamol of a February 1, 1965 brand development meeting/presentation recorded the conclusion that the cigarette manufacturer who could come up with a "flavorful" low tar cigarette with "enough nicotine to keep smokers hooked . . . will reap huge benefits." *US v. Philip Morris,* Amended Final Opinion Findings of Fact paragraphs 889-956, pages 352-374.

B.) Reynolds also had a sophisticated understanding of nicotine's role in smoking. For example, on November 16, 1967, RJR scientist Eldon D. Nielson responded to an inquiry about a nicotine inhibitor patent saying that the tobacco

8

companies would not want such an item, as they were "selling a nicotine effect, not fighting it."  A Reynolds report from 1972 titled "Research Planning Memorandum on the Nature of the Tobacco Business and the Crucial Role of Nicotine Therein," stated "if we meekly accept the allegations of our critics and move toward reduction or elimination of nicotine from our products, then we shall eventually liquidate our business. "…if we intend to remain in business and our business is the manufacture and sale of dosage forms of nicotine, then at some point we must make a stand. *US v. Philip Morris,* Amended Final Opinion, Findings of Fact paragraphs 957-987, pages 374-385.

14.  Despite knowing of the addictive properties of nicotine and designing their products as a nicotine delivery systems, at relevant times, the Defendants continued to deny same. *US v. Philip Morris,* Amended Final Opinion, Findings of Fact paragraphs 1149-1182, pages 447-456.

15.  Despite denying knowing of the addictive properties of nicotine, Defendants, individually, jointly, and through third parties, extensively studied smoking intake and inhalation, compensation, addiction physiology, smoker psychology, the pharmacological aspects of nicotine, the effects of nicotine on brain waves, and related subjects. As a result of this research, Defendants have been aware for decades that cigarettes are addictive and that smoking addiction is caused primarily by the delivery of dependence-producing levels of nicotine.  The typical cigarette sold by Defendants contains far more nicotine than an individual will inhale as he or she smokes.  Every aspect of a cigarette is

9

precisely tailored to ensure that a cigarette smoker can pick up virtually any cigarette on the market and obtain an addictive dose of nicotine. The cigarettes manufactured by Defendants used reconstituted tobacco material, additives, burn accelerants, ash conditioners, and buffering substances, all of which affected nicotine levels and delivery. Other cigarette design features used by Defendants to control nicotine delivery included filter design, paper selection and perforation, ventilation holes, leaf blending, and use of additives (such as ammonia) to control the PH of cigarette smoke.  *US v. Philip Morris,* Amended Final Opinion, Findings of Fact paragraphs 1366-1368, pages 515 and 516.  As a Federal Court in *Izzarelli v. R.J. Reynolds*, C.A. No. 3:99-cv-2338 (United States District Court, Connecticut) noted:

> With respect to the effective dose range of nicotine required to maintain addiction, R.J. Reynolds understood that, although an increase in free nicotine would enhance the addictive property of the cigarette, a decrease in the nicotine yield of the cigarette would increase the number of cigarettes required to meet the addiction demand. R.J. Reynolds recognized that "a given smoker on a given day has a rather fixed per hour and per day requirement for nicotine. Given a cigarette that delivers less nicotine than he desires, the smoker will subconsciously adjust his puff volume and frequency, and smoking frequency, so as to obtain and maintain his per hour and per day requirement for nicotine (or, more likely, will change to a brand delivering his desired per cigarette level of nicotine.)"  The effective daily dosage required to maintain addiction is five to eight milligrams of nicotine per day.  As early as 1959, R.J. Reynolds concluded that the nicotine yield should range from 1.5 to 2.0 mg per cigarette.

> *Izzarelli v. R.J. Reynolds*, Ruling on Motion for a New Trial and Renewed Motion for Judgment as a Matter of Law, Pages 7-8

16.  Despite their denials that they used such information for marketing purposes, the Defendants tracked youth in order to determine how best to induce them to start, and

continue, smoking cigarettes.  To cite just a few examples:

A.)  In August 1953, "A Study of People's Cigarette Smoking Habits and Attitudes," conducted by Elmo Roper for Philip Morris studied the smoking habits of a "cross section of men and women 15 years of age and over." Questions included: "How old were you when you started smoking?" and "What was your first regular brand?" The document indicated that Philip Morris had "very great strength among young people -- particularly under 20." An October 7, 1953 letter from George Weissman, Vice President of Philip Morris, discussed the August 1953 Roper report, and stated that "industry figures indicate that 47% of the population, fifteen years and older, smokes cigarettes" and that "we have our greatest strength in the 15-24 age group".  A document, titled "Teen-Age Cigarette Purchasing and Smoking Habits in the U.S.A. 1963," discussed a nationwide study of thirteen to eighteen year olds which examined the extent of teenage smoking, the volume of cigarettes smoked by teenagers, where teenagers obtained cigarettes, the extent to which minors purchased cigarettes from vending machines, and possible factors motivating teenagers to smoke. *US v. Philip Morris,* Amended Final Opinion, Findings of Fact paragraphs 2718-2720, page 1007 citing, *inter alia*, *State by Humphrey v. Philip Morris USA, Inc.* cited therein as *Minnesota v. Philip Morris (*Minn.Dist.Ct. May 8, 1998 No. C1-94-8565).

B.)  A December 1958 report prepared at Reynolds' request was titled "Summary of Findings" of "The Youth Research Institute Study Regarding Cigarette Smoking Among 8,112 High School and College Students in 82 Cities Throughout the United States, October-November, 1958."  The report included data and conclusions on smoking

incidence, smoking volume, and brand preferences of 3,052 high school students, 58% of whom were smokers, and 5,060 college students, 73% of whom were smokers. Both the high school and the college categories were further broken down into "freshman-sophomore" and "junior-senior" classes. A lengthy February 1964 report prepared for Reynolds by the William Esty Company summarizing a national report on smoking trends included further information on smoking incidence, smoking volume, and brand preferences for 8,863 families who participated in the National Family Opinion ("NFO") panel. Information in this report was collected on smokers as young as sixteen. *US v. Philip Morris,* Amended Final Opinion, Findings of Fact paragraphs 2844-2846, pages 1054-1055.

17. Similarly, the Defendants targeted young people (under eighteen and often much younger) by marketing specifically geared toward them to recruit replacement smokers. *US v. Philip Morris,* Amended Final Opinion, Findings of Fact paragraphs 2717-2780, 2953-2962, pages 972-1031,1096-1102.

### SPECIFIC ALLEGATIONS AS TO THE PLAINTIFF

18. George Bougopoulos began his use of tobacco products in 1960 at the tender age of 13 with the use of Lucky Strike Cigarettes or "Luckies", a product manufactured and marketed by RJ Reynolds or one of its corporate predeccessors. Indeed, to this day R. J. Reynolds continues to cater to a small but loyal market for the original, non-filter Lucky Strikes in the United States. At the time Mr. Bougopoulos began his smoking career, Lucky Strike cigarettes had a sizable market share backed up by aggressive advertising campaigns aimed at young people such as Bougopoulos. To this day, Mr. Bougopoulos

12

can remember many of the charming advertising slogans which persuaded him and other young people to partake of Lucky Strikes:

> Why don't you light up a Lucky?
> It's light up time, for the taste that you like
> Light up a Lucky Strike
> Relax, it's light up time
>
> Lucky Strike separates the men from the boys…
> But not from the girls.
> This is Lucky Strike
>
> Lucky Strike is the favorite cigarette among college
> smokers
>
> LSMFT- Luck Strike means fine tobacco

Just a few years later, and already addicted to nicotine, Mr. Bougopoulos switched to Marlboro cigarettes.  Marlboro cigarettes were then manufactured and marketed by Philip Morris Companies Inc. whose corporate successors are Altria Group, Inc. and  Philip Morris USA.  Philip Morris's marketing for its youth brand, Marlboro, was expressly designed to appeal to a young smokers, such as Bougopoulos  with a desire for peer acceptance by emphasizing Marlboro's popularity and status as the "number one" brand. In addition, the Marlboro brand was designed to appeal to one's manhood.  Mr. Bougopoulos can remember many of the charming advertising slogans which persuaded him and other young people to partake of Marlboros.  These include the television commercial which had the clever jingle:

> You're in Marlboro country,
> From the canyons of New York
> To the canyons of Colorado…

This commercial would then show a Marlboro cowboy standing on top of a building in

New York city and then show him standing on top of a mountain in Colorado.

19.  George Bougopoulos began his use of Lucky Strike and Marlboro cigarettes and was addicted to nicotine before the appearance of the first cigarette warning labels in 1966.  Said warning, appearing from 1966-1970, simply stated that "Cigarette Smoking May be Hazardous to Your Health ".

20.  Although Bougopoulos was aware of said warning labels and adverse publicity about cigarettes, he continued smoking due to his nicotine addiction and the contrary publicity generated by Defendants and organizations which they created and supported (e.g., the Tobacco Industry Research Committee, the Tobacco Institute and others).  To cite just one example Bougopoulos can remember watching a television documentary produced by the tobacco companies in which various tobacco company executives discussed how they, their spouses and their children all smoked and how they believed it was not hazardous.

21.  As described previously herein, Defendants, individually and jointly, engaged in an ongoing public relations effort beginning in the early 1950s, in addition to its advertising and promotion activities, designed to manipulate public opinion by creating doubt about the adverse health effects of smoking and to provide rationalizations to help smokers, such as Bougopoulos, keep smoking in spite of the adverse health effects. Many of these activities were carried out by the Tobacco Industry Research Council, Council on Tobacco Research, and Tobacco Institute, of which Defendants were members. Defendants' statements were intended to and did cause cigarette smokers such as the Plaintiff to continue smoking their cigarettes in spite of their adverse health effects.

14

22.  Bougopoulos did not know Defendant tobacco companies' representations were false. Bougopoulos reasonably relied on, and suffered as a result of Defendant tobacco companies' misrepresentations.

23.  In or around March of 2011, Bougopoulos was diagnosed with Chronic Obstructive Pulmonary Disease (COPD).  As described previously herein, COPD is caused by noxious particles or gas from tobacco smoking which triggers an abnormal inflammatory response in the lung.  Since his diagnosis, Mr. Bougopoulos:

- can no longer work
- must have an oxygen machine in his home which he needs to perform even minor exertions
- must sleep with the oxygen on double the dosage (4 liters)
- must bring a small oxygen machine with him when he goes out
- can no longer take his grandsons anywhere
- can no longer travel to Florida to visit his aged mother.

24.  As a result of the conduct of the Defendants, George C. Bougopoulos has incurred damages and is entitled to compensation.

COUNT ONE
PRODUCTS LIABILITY-STRICT LIABILITY

25.  Plaintiff reavers, realleges, and incorporates by reference paragraphs one through twenty four of this Complaint and makes them a part thereof as if expressly restated herein.

26.  Defendant RJ Reynolds was a seller engaged in the business of selling products (i.e., cigarettes) which were expected to and did reach Bougopoulos as the user or consumer without substantial change in the condition in which they were sold.

27.  Defendants Altria and Philip Morris were sellers engaged in the business of selling

products (i.e., cigarettes) which were expected to and did reach Bougopoulos as the user
or consumer without substantial change in the condition in which they were sold.

28.   Said products (cigarettes) were sold by Defendants to Bougopoulos in a defective
condition.  The effect of this defective condition was to increase Bougopoulos'
dependency on nicotine.  The defects in the products' condition included, but are not
limited to, the following:

    a. Defendants had added ammonia to increase the effects of nicotine;

    b. Defendants had altered the pH of cigarettes or cigarette smoke so as to increase the
       effect of nicotine;

    c. Defendants had controlled and manipulated the amount of nicotine in their
       cigarettes in such a way as to maintain the physical dependence of Plaintiff and
       other smokers on their cigarettes; and

    d. Defendants added materials to their cigarette tobacco so as to increase the effect of
       nicotine.

Defendants exploited the inability of smokers (such as Bougopoulos) to stop smoking and
used nicotine to keep smokers smoking.

29.   Said products (cigarettes) sold by Defendants to Bougopoulos were unreasonably
dangerous to Bougopolos as the user or consumer.  Said products were known by
Defendants to cause disease (including COPD), to cause respiratory ailments, and to
shorten life spans.  Defendants exploited the psychological needs of the young, such as
Bougopoulos when he started, and relied on them as replacement smokers for those who
died because of the adverse health effects of their cigarettes.  The effects of Defendants'

products are widespread and deadly, and Defendants have known this for many years.

30.  Accordingly, Defendants are each liable, jointly and severally liable, in damages to Plaintiff for the physical harm thereby caused Plaintiff as the ultimate user or consumer of Defendants' products.

COUNT TWO
PRODUCTS LIABILITY-MISREPRESENTATION BY SELLER
OF CHATTELS TO CONSUMER

31.  Plaintiff reavers, realleges, and incorporates by reference paragraphs one through thirty of this Complaint and makes them a part thereof as if expressly restated herein.

32.  Defendants were engaged in the business of selling chattels (i.e., cigarettes) by advertising, labels, or otherwise, and made to the public a misrepresentation or misrepresentations of a material fact or facts concerning the character or quality of the chattels sold by them.  Said misrepresentations included, but are not limited to, the following:

a. That there is "no proof" that cigarette smoking is a cause of  any human disease;

b. That if the tobacco companies really believed that cigarettes caused cancer, they would stop making them;

c. That the causal link between cigarette smoking and human disease was in doubt or "had not been proven"; and

d.  Cigarettes were not addictive nor designed to be addictive.

33.  Plaintiff did not know Defendants' representations were false.  Plaintiff justifiably relied on and has suffered physical harm as a result of Defendants' misrepresentations.

34.   Accordingly, Defendants are each liable, jointly and severally, in damages to

17

Plaintiff for the physical harm thereby caused Plaintiff as the ultimate user or consumer of Defendants' products.

COUNT THREE
PRODUCTS LIABILITY-SUPPLY OF CHATTELS UNLIKELY
TO BE MADE SAFE FOR USE

35.  Plaintiff reavers, realleges, and incorporates by reference paragraphs one through thirty-four of this Complaint and makes them a part thereof as if expressly restated herein.

36.  Defendants supplied directly, or through third persons, chattels (cigarettes) for Plaintiff's use, knowing or having reason to know that the chattels (cigarettes) were unlikely to be made reasonably safe before being put to a use which the Defendants should expect them to be put, are subject to liability for physical harm caused by such use to the Plaintiff whom the Defendants should have expected to use the chattels or to be endangered by their probable use, and who is ignorant of the dangerous character of the chattels or whose knowledge thereof does not make Plaintiff contributorily negligent.

37.  Defendants knew or had information from which they should know that there was a substantial probability that the chattels (cigarettes) would not be made safe before they were used.  Specifically, Defendants:

a. sold and distributed cigarettes which they knew or should have known contained poisonous substances capable of causing and likely to cause numerous serious injuries and diseases, including but not limited to, COPD;

b. sold and distributed products which they knew or should have known contained habit-forming and addictive substances capable of and likely to induce irresistible habits and/or physical and psychological dependence and addiction

18

when used in a foreseeable manner;

c. failed to manufacture and sell cigarettes without the characteristics described in

a. and b. above, thus depriving Bougopoulos of the opportunity to smoke a safer

cigarette.

38.   Accordingly, Defendants are each liable, jointly and severally, in damages to

Plaintiff for the physical harm thereby caused Plaintiff as the user of Defendants' products.

COUNT FOUR<br>NEGLIGENCE

39.   Plaintiff reavers, realleges, and incorporates by reference paragraphs one through

thirty-eight of this Complaint and makes them a part thereof as if expressly restated herein.

40.   Defendants owed a duty or duties to Bougopoulos to use reasonable care as

reasonably prudent and careful persons would use under similar circumstances.  The basis

of said duty or duties includes, but is not limited to, the Defendants continued

representations that they had an interest in people's health as a basic responsibility

paramount to every other consideration in their business, that whether cigarettes caused

human disease was an "open question", and denials that cigarette smoking was additive.

Having undertaken to make such representations, Defendants had a duty to ensure they

were made in good faith.

41.   Despite the existence of said duty or duities, Defendants marketed and sold

cigarettes to Plaintiff which they knew contained poisonous substances capable of

causing and likely to cause numerous serious injuries and diseases, including but not

limited to, COPD and which they knew or should have known contained habit-forming and addictive substances capable of and likely to induce irresistible habits and/or physical and psychological dependence and addiction.

42. As a consequence of said negligence, the Plaintiff has suffered damages. Defendants are each liable, jointly and severally, in damages to Plaintiff for the physical harm thereby caused Plaintiff as the user of Defendants' products.

COUNT FIVE
NEGLIGENT MISREPRESENTATION

43. Plaintiff reavers, realleges, and incorporates by reference paragraphs one through forty-two of this Complaint and makes them a part thereof as if expressly restated herein.

44. Defendants made a representation or representations to the Plaintiff with knowledge of its or their falsity or with conscious indifference to its or their truth. Specifically, Defendants marketed and sold cigarettes to Plaintiff which they knew contained poisonous substances capable of causing and likely to cause numerous serious injuries and diseases, including but not limited to, COPD and which they knew or should have known contained habit-forming and addictive substances capable of and likely to induce irresistible habits and/or physical and psychological dependence and addiction.

45. Defendants made said representation or representations with the intention to cause debtors to rely upon it or them and Plaintiff justifiably relied upon said representation or representations.

46. As a consequence of said actions, the Plaintiff has suffered damages. Defendants are each liable, jointly and severally, in damages to Plaintiff for the physical harm thereby

20

caused Plaintiff as the user of Defendants' products.

COUNT SIX
FRADULENT MISREPRESENTATION/DECEIT

47.  Plaintiff reavers, realleges, and incorporates by reference paragraphs one through forty-six of this Complaint and makes them a part thereof as if expressly restated herein.

48.  Defendants fraudulently made misrepresentations for the purposes of inducing Plaintiff to begin and continue cigarette smoking, and to refrain from quiting.  Plaintiff justifiably relied on said misrepresentations.

49.  Defendants recklessly and/or intentionally made fraudulent misrepresentations about their tobacco products, including deceitful statements about adverse health effects, the addictive nature of their tobacco products, and their contents.

50.  Defendants engaged in an ongoing public relations effort beginning in the early 1950s, in addition to their advertising and promotion activities, designed to manipulate public opinion by creating doubt about the adverse health effects of smoking and the addictive nature of nicotine and to provide rationalizations to help smokers keep smoking in spite of the adverse health effects. Many of these activities were carried out by the Tobacco Industry Research Council, Council on Tobacco Research, and Tobacco Institute, of which Defendants were members. Defendants' statements were intended to and did cause cigarette smokers such as Plaintiff to continue smoking their cigarettes in spite of their adverse health effects.

51.  Defendants knew that their products caused adverse health effects and were

21

addictive.

52.  Plaintiff did not know Defendants' representations were false.  Plaintiff reasonably relied on and has suffered as a result of Defendants' misrepresentations.

53.  As a consequence of said actions, the Plaintiff has suffered damages.  Defendants are each liable, jointly and severally, in damages to Plaintiff for the physical harm thereby caused Plaintiff as the user of Defendants' products.

COUNT SEVEN
NEW HAMPSHIRE CONSUMER PROTECTION ACT
RSA Chapter 358-A et seq.

54.  Plaintiff reavers, realleges, and incorporates by reference paragraphs one through fifty-three of this Complaint and makes them a part thereof as if expressly restated herein.

55.  The Defendants violated the New Hampshire Consumer Protection Act, RSA Chapter 358-A:2, by unlawfully using unfair methods of competition or unfair or deceptive acts or practices in the conduct of trade or commerce within this state. Such unfair methods of competition or unfair or deceptive acts or practices include, but are not limited to, the following:

    a.) misrepresenting the dangerous nature of their products;

    b.) misrepresenting the addictive nature of their products;

    c.) intentionally designing their products to be addictive; and

    d.) by other acts.

56.  Each and every one of the above acts was a willful or knowing violation of the New Hampshire Consumer Protection Act, RSA Chapter 358-A:2.

22

57. Accordingly, pursuant to RSA Chapter 358-A:I0, Plaintiff George Bougopoulos, as a person injured  by the Defendant's use of methods, acts or practices declared unlawful under said Chapter, brings an action for actual damages and for an award of as much as 3 times, but not less than 2 times, such amount as well as an award of the costs of this suit and reasonable attorney's fees.

## COUNT EIGHT
## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO)
### 18 U.S.C. §§ 1962(a)(b)(c) and (d); 1964(a); 1964(c)

58.  Plaintiff reavers, realleges, and incorporates by reference paragraphs one through fifty-seven of this Complaint and makes them a part thereof as if expressly restated herein.

59.  At all relevant times, George Bougopoulos was a "person" within the meaning of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961(3) and 1964(c).

60.  At all relevant times, Defendants Altria Group, Inc., Philip Morris USA Inc. and R.J. Reynolds Tobacco Company, Inc. were "persons" within the meaning of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961(3) and 1962(a)(b)(c) and (d).

61.  Defendants Altria Group, Inc., Philip Morris USA Inc., R.J. Reynolds Tobacco Company, Inc. and others comprised an "association-in-fact" enterprise (the "Enterprise") within the meaning of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961(4) and 1962(a)(b) and (c).  Each Defendant conducted or participated, directly or indirectly, in the conduct of the affairs of the Enterprise and each Defendant participated in the conduct, management, and operation of the Enterprise through a

pattern of racketeering activity in violation of 18 U.S.C. § 1962(a)(b)(c) and (d).  The
Enterprise is separate and distinct from the individual Defendants that participate in it and
direct its affairs.

   62.  At all relevant times, Defendants Altria Group, Inc., Philip Morris USA Inc. and
R.J. Reynolds Tobacco Company, Inc., as persons employed by or associated with an
enterprise engaged in or the activities of which affected interstate commerce, engaged in a
pattern of racketeering activity as defined in 18 U.S.C. §§ 1961(1) and (5) and within the
meaning of 18 U.S.C. §§ 1962(a)(b)(c) and (d), by making false representations, by using
mail, wire, radio and/or television in interstate commerce in violation of 18 U.S.C. §§
1341 and 1343.  Said misrepresentations included, but were not limited to, the following:

     (a.) denials that there were adverse health effects from smoking;

     (b.) false, misleading, and deceptive public statements designed to
       maintain doubt about whether smoking caused disease;

    (c.) denials about the addictiveness of smoking cigarettes and the role of nicotine
      therein; and

    (d.) the undertaking publicly announced duties to conduct and publicize
      disinterested and independent research into the health effects of smoking upon
      which the public could rely.

See generally, *US v. Philip Morris*, Amended Final Opinion, Findings of Fact Sections III
and V, pages 15-212, 219-1477.

   63.  The acts of racketeering activity referred to in this Complaint herein constituted a
"pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).  The acts alleged

were related to each other by virtue of common participants (Defendants Altria Group,

Inc., Philip Morris USA Inc., R.J. Reynolds Tobacco Company, Inc. and others), a

common victim or victims (Bougopoulos and others), a common method of commission

(making false representations about the adverse health effects and addictive nature of

cigarettes and tobacco products), the common purpose and common result of

obtaining money from victims such as Bougopoulos and enriching the Defendants at

victim's expense,

64.  Defendants Altria Group, Inc., Philip Morris USA Inc., R.J. Reynolds Tobacco

Company, Inc. and others, within the meaning of and in violation of 18 U.S.C. §

1962(a)(b) and (c), used the mails, wire, radio and/or television in interstate commerce to

misrepresent the harmful and addictive nature of cigarettes with the intention that smokers

such as Bougopoulos would rely on this information to their detriment.  Each Defendant:

    a.)  received income derived, directly or indirectly, from a pattern of racketeering

        activity and used or invested, directly or indirectly, part of such income, or the

        proceeds of such income, in the acquisition of interests in, or the establishment

        or operation of, said Enterprise which engaged in, or the activities of which

        affected, interstate or foreign commerce;

    b.)  through a pattern of racketeering activity acquired or maintained, directly or

        indirectly, an interest in or control of said Enterprise which was engaged in, or

        the activities of which affected, interstate or foreign commerce; and

    c.)  as persons employed by or associated with an enterprise engaged in, or the

        activities of which affect, interstate or foreign commerce, conducted or

participated, directly or indirectly, in the conduct of said Enterprise's affairs

through a pattern of racketeering activity.

Each Defendant committed at least two acts of racketeering within 10 years of one

another.

65.   Defendants Altria Group, Inc., Philip Morris USA Inc., R.J. Reynolds Tobacco

Company, Inc. and others, within the meaning of and in violation of 18 U.S.C. § 1962 (d),

conspired to violate §§ 18 U.S.C. 1962(a)(b) and (c) by using the mails, wire, radio and/or

television in interstate commerce to misrepresent the harmful and addictive nature of

cigarettes with the intention that smokers such as Bougopoulos would rely on this

information to their detriment.  Each Defendant committed at least two acts of

racketeering within 10 years of one another.

66.   If the Defendants Altria Group, Inc., Philip Morris USA Inc., R.J. Reynolds

Tobacco Company, Inc. and others had not conspired to keep the truth of the harmful and

addictive nature of cigarettes from the public, the Plaintiff Bougopoulos would not have

taken up smoking, would not have continued smoking for many years, would not have

become addicted to tobacco, and would not have become afflicted with Chronic

Obstructive Pulmonary Disease (COPD) with its attendant consequences.

67.   As a result of the Defendants' violations of 18 U.S.C. §§ 1962(a)(b)(c) and (d),

Bougopoulos has been injured in that:

 (a.)  he spent money on a product which, unknown to him, was harmful and addictive;

 (b.)  he lost income and incurred medical and other expenses due to his Chronic

         Obstructive Pulmonary Disease (COPD);

(c.)  he has suffered physically and mentally from his Chronic Obstructive Pulmonary
Disease (COPD) and will continue to suffer for the rest of his life; and

(d.)  he has been damaged in other ways.

68.   On or about August 17, 2006, the United States District Court for the District of
Columbia in *United States v. Philip Morris USA, Inc.,* Civil Action No. 99-2496 (Kessler,
J.) in an Amended Final Opinion (herein referenced as *US v. Philip Morris* Amended Final
Opinion) made specific determinations that the Defendants, by the conduct described
herein and other conduct, violated the Racketeer Influenced and Corrupt Organizations
Act ("RICO"), 18 U.S.C. § 1961, *et seq.*

69.   Accordingly, pursuant to the Racketeer Influenced and Corrupt Organizations Act
("RICO"), 18 U.S.C. §§ 1964(a) and (c), Bougopoulos is entitled to recover threefold his
damages and the cost of this suit, including reasonable attorney's fees from Defendants
Altria Group, Inc., Philip Morris USA Inc. and R.J. Reynolds Tobacco Company, Inc.

## JURY DEMAND

Plaintiff demands a jury trial on all claims.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff, George C. Bougopoulos, respectfully requests that this
Court:

1.   Award him damages for lost income, medical expenses, pain and suffering, and any
other damages which Plaintiff believes to be within the minimum and maximum limits of
this Court;

2.   Award him triple any said award pursuant to NH RSA Chapter 358-A, *et seq.*

27

and/or 18 U.S.C. § 1961, *et seq.*;

   3.  Award him costs and attorney's fees pursuant to NH RSA Chapter 358-A, *et seq.*

and/or 18 U.S.C. § 1961, *et seq.*; and

   4. Award him any such other relief to which he may be entitled.

Respectfully submitted
by Plaintiff's Attorney,

s/ John J. Washburn
John J. Washburn (NH Bar 14802)
99 Pine Hill Road, Suite 660
Nashua, New Hampshire  03063-2151
(603) 821-1861

September 3, 2012

28